UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MARION P. HAMMER,

                               Case No.:  4:18-cv-00329-RH-CAS

      Plaintiff,

v.

LAWRENCE T. "LOL"
SORENSEN, *et al.*,

      Defendants.

_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND ENTRY OF PERMANENT INJUNCTION
<u>AGAINST DEFENDANTS RISICA AND WEISS</u>**

Plaintiff, Marion P. Hammer ("Ms. Hammer"), by counsel and pursuant to Federal Rules of Civil Procedure 55(b) and 56 and Local Rules 7.1 and 56.1, moves for the entry of a partial summary judgment and permanent injunction against Defendants, Christopher Risica ("Mr. Risica") and Howard Weiss ("Mr. Weiss"), and in support states as follows:

<u>**Introduction**</u>

Ms. Hammer's well-being, tranquility, and privacy are of the highest order in our free and civilized society. *Frisby v. U.S.*, 487 U.S. 474, 484 (1988). The "right to be let alone" is "the most comprehensive of rights and the most valued of civilized men." *Hill v. Colorado*, 530 U.S. 703, 716-717 (citing *Olmstead v. U.S.*,

277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).   Like every other citizen, Ms. Hammer enjoys a First Amendment right to advocate for policies and governmental action (a right this Court recognized as essential to freedom [Doc. 33]) without fear or facing threats, coercion or intimidation.

Ms. Hammer sued Mr. Risica and Mr. Weiss (among others) because they targeted her with disgusting, hateful and abhorrent, threatening, intimidating, and harassing e-mails intended to cause her substantial and severe emotional distress and to prevent her from exercising her constitutional rights.   [Doc. 33; Doc. 1, ¶ 47]  No one has the right under the Constitution to send unwanted material into the home of another.  *Rowan v. U.S. Post Office*, 397 U.S. 728, 738 (1970); *Thoma v. Neal*, 180 So.3d 1157 (Fla. 4th DCA 2015).   No one has the right to interfere with another's exercise of their constitutional rights by threats, intimidation, or coercion.  § 760.51, *Fla. Stat.*; *Virginia v. Black*, 538 U.S. 343, 360 (2003).

The relief Ms. Hammer seeks through this motion is reasonable and appropriate:  a permanent injunction putting an end to harassment, threats, and personal attacks she endured and sending a clear message that targeted personal attacks masquerading as free speech will not be tolerated.   Mr. Risica's and Mr. Weiss' e-mails to Ms. Hammer are not protected speech.  They are intrusive, threatening, offensive, and unwelcome violations of Ms. Hammer's fundamental

rights that serve no legitimate purpose.   Mr. Risica's and Mr. Weiss' tortious conduct can and should be enjoined.

## I.   Procedural Background

On July 13, 2018, Ms. Hammer filed her Verified Complaint (Doc. 1) against Mr. Risica, Mr. Weiss, Mr. Sorensen, and Mr. Sullivan.   On September 7, 2018, the Court entered an Order (Doc. 26) granting Ms. Hammer's motion for default against Mr. Risica and instructing the Clerk to enter a default against Mr. Risica.   On September 10, 2018, the Clerk entered a default (Doc. 27).   On December 13, 2018, Ms. Hammer moved for the entry of a default against Mr. Weiss (Doc. 34).

Mr. Risica and Mr. Weiss are deemed to have admitted all well-pleaded factual allegations in the Verified Complaint.   *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.,* 561 F.3d 1298, 1307 (11th Cir. 2009).   Moreover, because the Complaint is verified,[1] Ms. Hammer is entitled to a partial summary judgment and permanent injunction.

## II.   Statement of Undisputed Facts

Ms. Hammer has been a prominent advocate of the Second Amendment for decades.   Doc. 1, ¶19.   In 1995, she became the first woman president of the NRA. *Id.*   Ms. Hammer currently lives and works as a lobbyist in Tallahassee, Florida.

---

[1]  Ms. Hammer's Verified Complaint [Doc. 1] is further supported by the facts set forth in Ms. Hammer's July 13, 2018 Declaration [Doc. 4].

*Id.* at ¶ 21.   Following the tragic shooting that occurred at Marjory Stoneman Douglas High School, Ms. Hammer became one of the focal points of a campaign of hate and vitriol including threats against her and her grandchildren, harassing phone calls, and numerous e-mails and other written communications that served no purpose other than to cause substantial emotional distress and to try to humiliate and intimidate Ms. Hammer.   *Id*. at ¶ 22.   Hammer's daily life drastically altered because of this harassment.   *Id*. at ¶¶ 24-25.

Mr. Risica sought out Ms. Hammer and sent her an unsolicited, unwelcomed e-mail containing threats and disgusting personal attacks:

> "Dear Twat.  You are a vile cunt.  I hope you get to experience a (*sic*) ammo dido (*sic*).  I can't wait till the day I flip on the news to see you mourning a gunshot victim.  You're disgusting and exactly what's wrong with people today.  I seriously hope karma comes around for you soon.  You and that other ammosexual the fairy Wayne LaPierre, what a masculine name to match the fairy he is.  I hope to see he died of a gunshot wound that took hours of pain before he succumbed…
>
> Fuck you.   You worthless cunt.   You're a whore, not a freedom fighter… I hope you don't (*sic*) a moment of peace for the rest of your pitiful lives…"

*Id*. at ¶¶ 39, 50; Ex. 30.

Mr. Weiss sought out Ms. Hammer and sent her an unsolicited, unwelcomed e-mail containing threats and disgusting personal attacks:

> The consequences that you will… be subjected to when you are killed by those weapons you have hawked for all these years will send you to burn in hell you fucking heartless, greedy bitch.  I pray everyday that one of these

> 'good' people puts 100 bullets between your eyes so we
> can celebrate.

*Id.* at ¶¶ 39, 50, Ex. 31.

Ms. Hammer suffered severe emotional distress as a result of Mr. Weiss'
and Mr. Risica's e-mails.  *Id.* ¶¶ 83, 106.  Their e-mails are extremely alarming and
hurtful, and Ms. Hammer perceived them as threats against her and her family.
Doc. 4 ¶ 26.   They are extremely distressing because of their violent and
aggressive tone, threatening nature, and abusive language.   *Id.* ¶ 27. If the
Defendants are not enjoined from sending such communications, Ms. Hammer will
not be able to return to her normal way of life and will have to continue living in
constant fear.  *Id.* ¶ 28.

### III.   <u>Standard for Default Judgment</u>

Upon entry of a default, a court may enter a judgment.  *See* Rule 55(b), *Fed.
R. Civ. P.*  However, prior to entering a default judgment, the "Court must ensure
that the Plaintiff's well-pleaded allegations properly state a claim for relief."
*Blowbar, Inc. v. Blow Bar Salon Inc.,* 2013 U.S. Dist. LEXIS 170145, 2013 WL
6244531 (M.D. Fla. 2013); *see also Tyco Fire & Sec., LLC v. Alcocer,* 218 Fed.
Appx. 860, 863 (11th Cir. 2007).   As set forth below, Ms. Hammer states
actionable claims for intentional infliction of emotional distress and intrusion upon
seclusion against Mr. Risica and Mr. Weiss, both of which support injunctive
relief.

IV.   **Standard for Summary Judgment**

Summary judgment should be granted if the evidence, viewed in a light most favorable to the non-movant, shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *Fed. R. Civ. P.* 56(c).  "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).  "The law is clear… that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."  *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366, 1371 (S.D. Fla. 1999).

V.   **Intentional Infliction of Emotional Distress**

"Under Florida law, a claim for intentional infliction of emotional distress has four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) the conduct caused the emotional distress, and (4) the emotional distress was severe."  *Lincoln v. Florida Gas Transmission Co. LLC*, 608 Fed. Appx. 721, 722 (11th Cir. 2015).  "To demonstrate that a defendant's infliction of mental suffering was deliberate or reckless, a plaintiff must show that the defendant's conduct was directed at the plaintiff."  *Id.* "To demonstrate that the defendant engaged in outrageous conduct, the plaintiff must show that the defendant's actions were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Id.* (citations and quotation marks omitted).   In evaluating whether conduct reaches this level, the court makes an objective determination.  *Id.*  With respect to the emotional distress requirement, severe emotional distress exists when no reasonable person should be expected to endure it.  *Restatement Second, Torts* § 46; *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985)

Mr. Risica and Mr. Weiss acted intentionally, deliberately, and/or recklessly when they sought out Ms. Hammer's email address and sent her threats and highly offensive personal abuse and attacks.  Doc. 1 ¶39.  Their e-mails were outrageous, beyond all bounds of decency, and utterly intolerable in a civilized community. *Id.,* Exhibits 30-31.   Taunting any person with the patently harmful words Defendants used alongside threats about how Ms. Hammer should be "mourning a gunshot victim," "experience[ing] a ammo [dildo]," and getting "100 bullets between [her] eyes" exceeds all bounds of decency and would substantially upset a normal person in the same position as Ms. Hammer.  *See, T.B. v. State*, 990 So.2d at 655.   Any reasonable person seeing statements asserting that Ms. Hammer shouldn't get "a moment of peace for the rest of [her] pitiful [life]," and will be "killed by those weapons you have hawked all these years," would fear harm is imminent and will continue.  Ms. Hammer was forced to fear for her safety and her

family's safety, to the point her personal and professional life drastically altered. *See id.,* ¶ 24-25; 83; see also Doc. 4 ¶¶ 11, 26-28.

## VI.   <u>Intrusion Upon Seclusion</u>

In *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003), Florida's Supreme Court defined intrusion upon seclusion as "physically or electronically intruding into one's private quarters." The tort extends to electronic intrusions into one's privacy. *See Zirena v. Capital One Bank (USA) NA*, 2012 WL 843489 at *2 (S.D. Fla. Feb. 2, 2012) (defining intrusion tort as "physically *or electronically* intruding into one's private quarters" and holding that harassing phone calls were actionable).

The Restatement (Second) of Torts defines intrusion upon seclusion as "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). Although the Florida Supreme Court has not expressly adopted Section 652B, Florida and Federal courts have cited it. *See Forsberg v. Housing Auth. of City of Miami Beach,* 455 So.2d 373, 376 (Fla.1984) (Overton, J., concurring); *Purrelli v. State Farm Fire and Casualty Co.,* 698 So.2d 618, 620 (Fla. 2d DCA 1997); *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303, 1309 (M.D. Fla. 2010); *Spilfogel v. Fox Broad. Co.*, 09-CV-80813, 2010 WL 11504189, at *5 (S.D. Fla. May 4, 2010).

Mr. Risica and Mr. Weiss electronically intruded upon Ms. Hammer's solitude by sending unsolicited, offensive, hate-filled, threatening, and unwelcomed e-mails to her personal email address.  Doc. 1 ¶39, Exhibits 30-31. Unwillingly, Ms. Hammer experienced threats, intimidation, and highly offensive, disgusting, and abhorrent materials within the sanctity of her private quarters.

The intrusion upon seclusion tort serves to protect an individual's recognized interest in their tranquility and the sanctity of their home:

> One important aspect of residential privacy is protection of the unwilling listener [or here, viewer].  Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different…[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Gilbreath v. State*, 650 So.2d 10, 12-13 (Fla. 1995) (*citing Frisby*, 487 U.S. at 484-85) (prohibiting harassment is not prohibiting speech because harassment is not protected speech).  Simply stated, Ms. Hammer cannot be forced to welcome and accept the intrusion of Mr. Risica's and Mr. Weiss' unwanted, threatening, and harassing e-mails.

## VII.  Defendants are Not Shielded by the First Amendment

### A.   The E-mails Were Nonpublic and Hammer Was a Captive Audience

Although inappropriate, disgusting speech must be tolerated on a certain level to provide "breathing space" to the freedoms protected by the First Amendment, there is an equally important, parallel constitutional right Ms. Hammer enjoys that outweighs any First Amendment concerns in this case: "[T]he state's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.". *Snyder*, 562 U.S. at 458 (quoting *Boos v. Barry,* 485 U.S. 312, 322 (1988)); *Frisby*, 487 U.S. at 484.  The importance of public discourse necessarily co-exists with and must be balanced against every individual's freedom to be let alone.  *Hill*, 530 U.S. at 716-17.

"[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions.  Thus we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom."  *Frisby*, 487 U.S. at 484-85.  "No one has a right to press even 'good' ideas on an unwilling recipient."  *Rowan*, 397 U.S. at 738.  "Without doubt the public postal system [like e-mail] is an indispensable adjunct of every civilized society and communication is

imperative to a healthy social order.  But the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate."  *Id.* at 736.

In recognition of the required balancing of individual freedom and free speech,[2] courts facing First Amendment challenges are required to examine the content, form, and context of the speech at issue, "including what was said, where it was said, and how it was said."  *Snyder*, 562 U.S. at 453-54.  No one factor is dispositive, and it is necessary to evaluate all the circumstances of the speech.  *Id*.

Here, Mr. Risica's and Mr. Weiss' inappropriate and disgusting e-mails were sent unsolicited and unwelcomed in a nonpublic setting and a format in which their offensive, abusive content immediately displayed to Ms. Hammer when they were opened.  Protecting public discourse in public settings recognizes the core values underlying the First Amendment.  However, those same values are not at play where speech (even speech about matters of legitimate public concern) is only between two individuals and directed into one's home or private quarters.  At that point, speech crosses the line and can be constitutionally restricted.

The method of Mr. Risica's and Mr. Weiss' chosen form of communications determines their unprotected status because speech that intrudes on the privacy of one's home is not protected by the First Amendment.  *Frisby*, 487 U.S. at 484-87; *Rowan,* 397 U.S. at 738; *Hill*, 530 U.S. at 716; *F.C.C. v. Pacifica Foundation*, 438

---

[2]  "[T]he right of every person "to be let alone' must be placed in the scales with the right of others to communicate."  *Rowan*, 397 U.S. at 737.

U.S. 726, 748-49 (1978); *Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949); *Schneider v. State*, 308 U.S. 147, 162-62 (1939); *Martin v. Struthers*, 319 U.S. 141 (1943); *State v. Elder*, 382 So.2d 687, 692 (Fla. 1980)(noting our high courts "have recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue," and, thus, "the privacy interest of a person may be accorded greater protection within the sanctum of the home or other private place than it may be accorded in the public forum").

While recognizing the importance of uninhibited, robust, and wide-open debate on public issues, the Supreme Court made it clear that "even protected speech is not equally permissible in all places and at all times." *Frisby*, 487 U.S. at 479 (quoting *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 799 (1985).   "To ascertain what limits, if any, may be placed on protected speech, we have often focused on the "place"[3] of that speech, considering the nature of the forum the speaker seeks to employ." *Id.*

---

[3] The standards by which limitations on speech must be evaluated depend on its setting, which falls into three categories: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Id.* at 479-80 (citing *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983); *Cornelius*, 473 U.S. at 802).  Public streets are repeatedly referred to as the "archetype" public forum. *Id.* at 480.  Conversely, one's home ("the last citadel of the tired, the weary, and the sick" and the "one retreat to which men and women can repair to escape from the tribulations of their daily pursuits") is the archetype nonpublic forum. *Id.* at 484.

Individuals are not required to welcome unwanted speech into their own homes. *Gilbreath*, 650 So.2d at 12-13. "[T]he Supreme Court has repeatedly recognized the right of citizens to avoid unwanted communication, ***even in cases involving core political speech***, as part of citizen's broader right to be left alone." *Free Speech Coalition, Inc. v. Shurtleff*, 2007 WL 922247, *13 (D. Utah Mar. 23, 2007) (citing *Hill*, 530 U.S. at 716-17) (emphasis added).

Mr. Risica and Mr. Weiss chose to communicate *privately* with Ms. Hammer, not in one of the many protected public settings available to redress their grievances. Such targeted speech can be regulated by the State because it does not "seek to disseminate a message to the general public, but to ***intrude*** upon a targeted resident, and to do so in an ***especially offensive way***." Frisby, 487 U.S. at 486 (emphasis added). Offensive intrusions are precisely the type of conduct the intrusion upon seclusion and intentional infliction of emotional distress torts are intended to prohibit.

"The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is … dependent upon a showing that substantial privacy interests are being invaded in an essentially ***intolerable*** manner." *Snyder*, 562 U.S. at 459. (citing *Cohen*, 403 U.S. at 21) (emphasis added). An intolerable intrusion occurs where a "captive audience" is involved. Merely offensive speech can be prohibited "as intrusive when the 'captive'

audience cannot avoid [it]." *Frisby*, 487 U.S. at 487 (citing *Consolidated Edison Co. v. Public Service Comm'n of New York*, 447 U.S. 530, 542 (1980)).

The captive audience doctrine is applied sparingly but specifically in the context of mail. "In today's complex society we are inescapably captive audience for many purposes, but a sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail." *Rowan*, 397 U.S. at 736. "It places no strain on the doctrine of judicial notice to observe that whether measured by pieces or pounds, Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know. And all too often it is matter he finds offensive." *Id.* The Supreme Court's observations about mail in *Rowan* apply with equal force to e-mail.

Where a private setting or captive audience is involved, concern over regulating civility or offensiveness and chilling public disclosure gives way to the obligation to protect an individual's privacy, freedom, and right to be let alone. "The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience. But the protection afforded offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill*, 530 U.S. at 716. The unwilling listener's interest in avoiding unwanted communication has been repeatedly

identified as an aspect of the broader "right to be let alone," which "one of our wisest Justices characterized as 'the most comprehensive of rights and the most valued of civilized men.'" *Id.* at 716-17 (citing *Olmstead v. U.S.,* 277 U.S. 438, 478 (1928)).  "The right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings, but can also be protected in confrontational settings." *Id.* at 717 (citing *Rowan*, 397 U.S. at 738; *Frisby*, 487 U.S. at 485).  The Court's duty to protect an individual's privacy, freedom, and liberty in such settings does not in any way punish or deter the robust public discourse essential to freedom.  Citizens can be held liable for and certainly enjoined from sending strong words privately targeted at an individual.

The rule that even protected speech can be prohibited in one's home recognizes the concept that an unwanted intrusion can be characterized as a right thing in the wrong place – "like a pig in the parlor instead of the barnyard." *Pacifica Foundation*, 438 U.S. at 750 (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926)).  Once a pig enters the parlor, the use of governmental power to deal with it does not depend on proof that the pig was obscene.  *Id.* Several cases illustrate this point.

In *Rowan*, the Supreme Court held the Postal Services' prohibition against certain mailers was constitutional:

> Weighing the highly important right to communicate, but without trying to determine where it fits into

> constitutional imperatives, against the very basic right to
> be free from sights, sounds, and intangible matter we do
> not want, it seems to us that a mailer's right to
> communicate must stop at the mailbox of an unreceptive
> addressee.
> …
>
> Nothing in the Constitution compels us to listen to or
> view any unwanted communication, whatever its merit;
> we see no basis for according the printed word or
> pictures a different or more preferred status because they
> are sent by mail.  The ancient concept that "a man's
> home is his castle' into which 'not even the king may
> enter' has lost none of its vitality, and one of the
> recognized exceptions includes any right to communicate
> offensively with another.

*Rowan*, 397 U.S. at 736 (citing *Camara v. Municipal Court*, 387 U.S. 523 (1967).

If a restraint on speech targeted to a person's home "operates to impede the flow of

even valid ideas, the answer is that no one has a right to press even 'good' ideas on

an unwilling recipient."  *Id.*

*Shurtleff* recognizes (based on *Rowan*, *Frisby*, *Hill* and *Pacifica Foundation*)

e-mails raise the same captive audience problem as regular mail.  2007 WL 922247

at *14.  *Shurtleff* involved e-mails of a sexual nature the plaintiff argued could not

be restricted under the First Amendment.   *Id.* at *13.   Like indecent radio

broadcasts, "unsolicited sexual email unquestionably raises the captive audience

problem."  *Id.* at *14.  In rejecting the plaintiff's First Amendment argument, the

Utah District Court recognized "[s]tates may enact legislation enabling its citizens

***to prohibit even core political speech*** from their own private domains without

running awry of the First Amendment."   *Id*. (citing *Hill*, 530 U.S. at 716-17) (emphasis added).   The justification is privacy and the ability to avoid intrusions. *Id.*   Moreover, where the sanctity of the home is involved, prohibiting or restricting speech does not implicate any "chilling effect" because "there is no chilling effect on unwanted speech."   *Id.* (citing *Rowan*, 397 U.S. at 736-37).   "To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home."   *Id.*

One Florida appellate court specifically addressed the application of the First Amendment to offensive, but not threatening, mail.   *Thoma v. O'Neal*, 180 So.3d 1157 (Fla. 4th DCA 2015).   *Thoma* involved an injunction for protection under Section 784.0485, Florida Statutes.   The victim obtained an injunction based on harassment that included the defendant sending a "flyer" identifying the victim and reading (among other things) "Ask [victim] to please stop assisting the abortionist with the killing of black babies."   *Id.* at 1159.   The defendant challenged the injunction based on the First Amendment and the appellate court affirmed.

Florida's appellate court in *Thoma* concluded the mail at issue was protected speech under the First Amendment, "if one focuses on whether the flyer expresses a 'true threat' of physical or emotional harm."   *Id.* at 1160.   "But, whether the flyer expresses a 'true threat' is not the end of the First Amendment analysis."   *Id.*  The

appellate court relied upon *Frisby* and *Rowan* to uphold the injunction based on the flyer and held:

> Although the flyer cannot be construed as a "true threat" of violence as that concept has been defined for First Amendment analysis, we agree, as the trial judge stated on the record, the flyer "crosses the line," in terms of First Amendment protection, because the mailing of the flyer to the Victim's home, by itself, was an attempt to force unwanted speech upon her in the privacy of her home.

*Id.* at 1161.  The First Amendment does not permit a defendant to force a message on a victim through the mail that she does not want to see or hear.  *Id.* at 1161-62.

One important aspect of the captive audience doctrine is its applicability to both protected and offensive speech.  *Pacifica Foundation*, 438 U.S. at 749; *Thoma*, 180 So.3d at 1160; *Hill*, 530 U.S. at 716.  Where an audience is captive, speech need not communicate a threat to be actionable.  *Thoma*, 180 So.3d at 1160.  Courts are empowered to (and should) ferret out incivility when it is directed into someone's home.  *Rowan*, 397 U.S. at 736 (nothing in the Constitution compels us to view any unwanted communication, whatever its merit); *Frisby*, 487 U.S. at 487 (objectionable speech can be prohibited when a captive audience cannot avoid it).

The rationale underlying cases such as *Rowan*, *Shurtleff*, and *Thoma* is even more compelling when applied to e-mail because of its prevalence and the ease with which it permeates into our private lives.  Much like public broadcasts, e-mail has established a uniquely pervasive presence in the lives of all Americans.

*Pacifica Foundation*, 438 U.S. 726, 748 (1978).   Patently offensive material presented through e-mail confronts citizens in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.  *Id. (citing Rowan*).   Prior warnings cannot completely protect the listener or viewer from unexpected content.  *Id.*   Consequently, "[t]o say that one may avoid further offense by turning off the radio when he hears indecent language [or close an e-mail when it contains graphic images of shooting victims] is like saying that the remedy for an assault is to run away after the first blow.   One may hang up on an indecent phone call, but that option does not give the caller constitutional immunity or avoid a harm that has already taken place."  *Id.* at 749.

Each medium of expression presents special First Amendment problems.  *Id.* at 748 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502-503 (1952)). Broadcasting has received the most limited First Amendment protection because of its intrusion into the privacy of the home and accessibility to children.  *Id.* at 748-49.   E-mails should be treated similarly, *Shurtleff*, 2007 WL 922247 at *14, particularly because regular mail is already considered intrusive.  *Rowan*, 397 U.S. at 736; *Thoma*, 180 So.3d at 1161.

**B.     True Threats, Harassment, and/or Intimidation Can Be Enjoined**

None of Ms. Hammer's claims *require* a "true threat" to be actionable.  The existence of a true threat is an *additional* basis to find the First Amendment does not apply to Defendants' e-mails.  *Black*, 538 U.S. at 358-59.

A threat is an "expression of an intention to inflict evil, injury, or damage on another."  *Planned Parenthood of Columbia/Williamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002).  Threats, however communicated, are proscribable under the First Amendment.  *Id.* at 1076 (citing *Madsen*, 512 U.S. at 773).  Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners, because history can give meaning to the medium.  *Id.*  "The fact that a threat is subtle does not make it any less of a threat."  *Id.*  The prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."  *Black*, 538 U.S. at 360 (citing *Watts v. U.S.*, 394 U.S. 705, 708 (1969)).

 In *Black*, the Supreme Court held a statute criminalizing cross burning with the intent to intimidate another person was constitutional.  538 U.S. at 363.  Regarding context, the Supreme Court noted "burning a cross does not inevitably convey a message of intimidation."  *Id.* at 357.  Sometimes a cross burning is a

statement of ideology, and if done at a political rally would almost certainly be protected expression. *Id.* at 366-67 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 402 (1992)). But that form of expression must be distinguished from cross burnings on a neighbor's lawn or directed at an individual (the proverbial pig in the parlor). *Id.*

Here, Defendants sent threatening and intimidating e-mails into Ms. Hammer's home. They did so at a time when Ms. Hammer was the focal point of a campaign of threats and attacks and amidst escalating aggression against the NRA and violent confrontations with politicians. (Doc. 1 ¶¶ 22, 40-44) When viewing the e-mails in their full setting, it is reasonable to conclude they were explicit or implicit threats.

Ms. Hammer also maintains the e-mails were sent to intimidate her from advocating for the Second Amendment. [Doc. 29, p. 10] Florida law recognizes that interference with the exercise or enjoyment of constitutional rights is unlawful. § 760.51, *Fla. Stat.* Ms. Hammer specifically alleges she "restrain[ed] her own constitutional rights… over fears that the harassment and threats against her will escalate and expose bystanders to physical harm." (Doc. 1 ¶ 25) Although Florida's anti-coercion statute (§ 760.51) does not provide a private cause of action, Florida common law recognizes interference with one's constitutional rights through threats, coercion, and/or intimidation supports injunctive relief:

> Personal liberty and private property are fundamental
> rights in this country. The very purpose of law is to

> protect these rights.  Any unlawful interference with them by false statement, acts of coercion, intimidation, malice or overt implications that threaten mischief or injury to them may be enjoined.

*Paramount Enterprises v. Mitchell*, 140 So. 328, 332-33 (Fla. 1932).

Thus, even if the Court believes Defendants' e-mails are not a true threat, they are a form of harassment or intimidation that can be enjoined.  *Paramount Enterprises*, 140 So. at 332-33; *Siegel*, 867 So.2d at 464.  Combining a threat or intimidation with issues of public concern does not absolve Defendants of liability. *Saidi v. State*, 845 So.2d 1022, 1026 (Fla. 5th DCA 2003) (citing *U.S. v. Bellrichard*, 994 F.2d 1318, 1322 (8th Cir. 1993)).

## VIII.  Standards Governing Permanent Injunctive Relief

Permanent injunctive relief is proper when the plaintiff establishes three elements: (1) the act or conduct to be enjoined violates a clear legal right; (2) there is no adequate remedy at law; and (3) injunctive relief is necessary to prevent an irreparable injury.  *Legakis v. Loumpos*, 40 So. 3d 901, 903 (Fla. 2d DCA 2010); *Hollywood Towers Condo. Ass'n, Inc. v. Hampton*, 40 So. 3d 784, 786 (Fla. 4th DCA 2010).  The public interest also should be considered.  *Shaw v. Tampa Elec. Co.*, 949 So.2d 1066, 1069 (Fla. 2d DCA 2007).  The equities must also be balanced, including whether the potential harm to the defending party outweighs the benefit to the plaintiff.  *Liza Danielle, Inc. v. Jamko, Inc.*, 480 So. 2d 735 (Fla. 3d DCA 1982).  The Court must also consider the totality of circumstances and

determine whether injunctive relief is necessary to achieve justice. *Davis v. Joyner*, 409 So.2d 1193, 1195 (Fla. 4th DCA 1982).[4]

## IX.   Permanent Injunctions Are Not Prior Restraints

An injunction prohibiting expression imposed after an adjudication on the merits is not a prior restraint and is not subject to the heightened burden of proof that applies to a preliminary injunction.  Thus, this Court may properly enjoin Mr. Risica's and Mr. Weiss' tortious conduct. *Advanced Training Systems, Inc. v. Caswell Equipment Co.*, 352 N.W.2d 1, 11 (Minn. 1984) ("…the special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment") (citing *Pittsburgh Press Co. v. Commission on Human Relations*, 413 U.S. 376, 390 (1973)).

---

[4] The propriety of an injunction against a tort depends upon a comparative appraisal of all of the factors in the case, including the following primary factors: (a) the nature of the interest to be protected; (b) the relative adequacy to the plaintiff of injunction and of other remedies; (c) any unreasonable delay by the plaintiff in bringing suit; (d) any related misconduct on the part of a plaintiff; (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied; (f) the interests of third persons and of the public; and (g) the practicability of framing and enforcing the order or judgment. *Davis*, 409 So.2d at 1195 (citing with approval Restatement (Second) of Torts § 936 (1979)).

**X.   Injunctions are Appropriate to Prevent Harassment, Threats, Intimidation, and Personal Abuse**

The availability of injunctive relief to protect personal liberties is well-rooted.  *Paramount Enterprises*, 140 So. at 332-33.   In addition, Florida law provides harassment can be enjoined:

> Harassment is not speech:  it is wrongful conduct.  The Florida Supreme Court has recognized that the government has a strong and legitimate interest in preventing the harassment of individuals… Prohibiting harassment is not prohibiting speech, because harassment is not protected speech.   Harassment is not communication, although it may take the form of speech.

*Animal Rights Foundation of Florida, Inc. v. Siegel*, 867 So.2d 451, 464 (Fla. 5th DCA 2004) (concurring opinion) (quotations and citation omitted).   "Because harassment is improper conduct, it may be prohibited, or at least regulated, through an injunction."  *Id.* (*citing Kimball v. Florida Dep't of Health & Rehabilitative Servs.*, 682 So.2d 637 (Fla. 2d DCA 1996) (holding that persons subject to harassment may obtain injunctive relief); *see also Gilbreath*, 650 So.2d at 12 (Fla. 1995) (prohibiting harassment is not prohibiting speech because harassment is not protected speech).

In addition to common law grounds to enjoin harassment, injunctive relief is available to prevent intentional torts; and even to prohibit speech when that speech is uttered incident to a tort.  *Murtaugh v. Hurley*, 40 So.3d 62, 65-66 (Fla. 2d DCA 2010); *Chevaldina v. R.K./FL Management, Inc.*, 133 So.3d 1086 (Fla. 3d DCA

2014); *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So.2d 1371 (Fla. 4th DCA 1987). Specific to Ms. Hammer's intrusion upon seclusion claim, injunctions are appropriate to enjoin privacy torts. *Wolfson v. Lewis*, 924 F. Supp. 1413 (E.D.P.A. 1996).

## XI.   Ms. Hammer is Entitled to an Injunction

Ms. Hammer seeks a narrowly tailed permanent injunction against Mr. Risica and Mr. Weiss prohibiting them from: (i) inflicting any emotion distress upon Ms. Hammer through emails or other written or verbal communications containing the words and language set forth in Exhibits 30-31 of the Complaint; (ii) intruding upon Ms. Hammer's seclusion through emails and other electronic communications containing the words and language set forth in Exhibits 30-31 of the Complaint; and (iii) providing any other terms the Court deems necessary for Ms. Hammer's protection.

### A.   Ms. Hammer has suffered irreparable injury and remedies available at law are inadequate to compensate for that injury

As outlined above, Ms. Hammer has suffered and continues to suffer substantial and severe emotional distress. This distress is irreparable harm that supports injunctive relief. *E.E.O.C. v. Chrysler Corp.*, 546 F. Supp. 54, 70 (E.D. Mich. 1982); *Tugg v. Towey*, 864 F. Supp. 1201, 1208-09 (S.D. Fla. 1994). Monetary damages alone cannot compensate Ms. Hammer for living in constant fear and drastically changing her daily life. The chilling effect on Ms. Hammer's

daily activities, professional life, and First Amendment rights also is irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Stewart v. Sun Sentinel Co.*, 695 So.2d 360, 363 (Fla. 4th DCA 1997); *Southard v. Forbes, Inc.*, 588 F.2d 140, 145 (5th Cir. 1979); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *Gainesville Woman Care, LLC v. State*, 210 So.3d 1243, 1263 (Fla. 2017); *see* also *Garcia v. Lawn*, 805 F.2d 1400, 1405 (9th Cir. 1986) (recognizing that the chilling effect of retaliatory activity can constitute irreparable harm); *Northeastern Fla. Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). The irreparable harm that could result when others are threatened by the potential consequences of physical violence directed towards another is also well-recognized. *Conley*, 637 So.2d at 375; *see also National Abortion Federation v. Center for Medical Progress*, 2016 WL 454082, *22 (N.D. Cal. Feb. 5, 2016)

> **B.    The Potential Harm from an Injunction is Minimal and Far Outweighed by the Irreparable Harm to Ms. Hammer**

Mr. Risica and Mr. Weiss engaged in tortious conduct that is not protected by the First Amendment. Conversely, Ms. Hammer is being victimized by abhorrent threats and harassment that serve no legitimate purpose and are chilling her First Amendment rights and drastically impacting her daily life. There is very little, if any, harm to Defendants if an injunction issues. However, if they are not enjoined, the irreparable harm Ms. Hammer is suffering will continue and

potentially increase substantially, possibly resulting in physical and further emotional harm to Ms. Hammer and others.

## C.    The Public Interest Favors Granting an Injunction

The public has a significant interest in prohibiting the misconduct to which Ms. Hammer is being subjected.  Ms. Hammer's First Amendment rights, which are being chilled because of the threats and harassment she is enduring, are public rights that must be protected against criminal and tortious attacks.  *Richmond Newspapers, Inc.*, 448 U.S. at 574.  The protection of these rights is of paramount public importance.

There also is a significant public interest to be protected by adjudicating that hateful and abhorrent threats and harassment communicated through e-mails are intolerable and will be enjoined, particularly in the current social climate.  An injunction sends the clear message that, regardless of political affiliation or viewpoints, individuals engaged in political speech on issues of great public importance cannot be intimidated and victimized for their beliefs and the policies they publicly support.  A significant number of people are impacted by electronic abuse and harassment. Without question, the public interest is served by assuring society that there is recourse against such misconduct and that its victims will be protected by the law.

## XII.   Conclusion

Based on the specific circumstances of this case, permanent injunctive relief is an appropriate remedy.  Ms. Hammer seeks a permanent injunction restraining Mr. Risica and Mr. Weiss from harassing, intimidating, and threatening her through e-mails, specifically including the language in Exhibits 30 and 31 of the Verified Complaint, as well as providing any other terms the Court deems necessary for the protection of Ms. Hammer.

Respectfully submitted this 2nd day of January, 2019.

> */s/ Shane B. Vogt*
> Kenneth G. Turkel – FBN 867233
> E-mail:  kturkel@bajocuva.com
> Shane B. Vogt – FBN 257620
> Email:  svogt@bajocuva.com
> BAJO | CUVA | COHEN | TURKEL
> 100 North Tampa Street, Suite 1900
> Tampa, Florida 33602
> Tel.: 813-443-2199
> Fax: 813-443-2193
> *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Local Rule 7.1(F), that this Motion/Memorandum contains 6,647 words, based on the word count of the word-processing system used to prepare the motion/memorandum.

/s/ Shane B. Vogt
Attorney

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K),  Plaintiff, Marion P. Hammer, respectfully requests oral argument on this Motion.  Plaintiff estimates one (1) hour of hearing time will be necessary.

/s/ Shane B. Vogt
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 2, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

I FURTHER CERTIFY that on January 2, 2019, the foregoing document was served via e-mail and U.S. Mail to the following:  Christopher Risica, 7 Franklin Street, New London, Connecticut 06320, ███████████; and Howard    Weiss,   5    Marina    Plaza,    Antioch,    California   94509, ████████████.

/s/ Shane B. Vogt
Attorney